1   LUKENS LAW GROUP
    WILLIAM M. LUKENS (SBN 037196)
2   JENNIFER L. JONAK (SBN 191323)
    One Maritime Plaza, Suite 1600
3   San Francisco, CA 94111
    Telephone: (415) 433-3000
4   Facsimile: (415) 781-1034

5   Attorneys for Plaintiff John C. Rezner

6

7            UNITED STATES DISTRICT COURT

8          NORTHERN DISTRICT OF CALIFORNIA

9

10  JOHN C. REZNER, an individual,              Case No.

11            Plaintiff,                        **C 06 2064**

12       v.

13  BAYERISCHE HYPO-UND VEREINSBANK            **COMPLAINT FOR VIOLATION
    AG, a corporation; HVB STRUCTURED          OF RICO, FRAUD,
14  FINANCE, INC., a corporation; HVB AMERICA, NEGLIGENCE AND UNFAIR
    INC., a corporation; HVB CAPITAL MARKETS,  BUSINESS PRACTICES**
15  INC., a corporation; HVB RISK MANAGEMENT
    PRODUCTS, INC., a corporation; DOMENICK
16  MARIO DEGIORIO, an individual; RANDALL S.
    BICKHAM, an individual; SKYLINE            **DEMAND FOR JURY TRIAL**
17  ADVISORY SERVICES, LLC, a limited liability
    corporation; and DOES ONE THROUGH
18  THIRTY, inclusive;

19            Defendants.

20       Plaintiff John C. Rezner alleges as follows:
21                 **JURISDICTION AND VENUE**
22       1.      This is an action for damages arising out of defendants' violations
23  of Sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations
24  Act of 1970 (18 U.S.C. §§ 1961 *et seq.*) ("RICO"), fraud, conspiracy, inducing breach of
25  fiduciary duty, and unjust enrichment.
26       2.      The Court has jurisdiction over the subject matter of this action
27  pursuant to 28 U.S.C. § 1331 because the RICO claim raises a question of federal law, and
28

1   under 28 U.S.C. § 1367 because the remaining state law claims are so related to the RICO

2   claim that they form a part of the same case or controversy and fall within this Court's

3   supplemental jurisdiction.

4         3.    Venue is proper in the Northern District of California pursuant to

5   28 U.S.C. § 1965(a) because the defendants are found, reside and/or transact affairs in this

6   District; pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that the

7   parties residing in any other district be brought before this Court; pursuant to 28 U.S.C. §

8   1291(b) because a substantial part of the events or omissions giving rise to this action

9   occurred in this District; and/or pursuant to 28 U.S.C. § 1391(b) because one or more of

10   the defendants is found in and is subject to personal jurisdiction in this District.

11   **PARTIES**

12         4.    Plaintiff John C. Rezner is an individual and a United States citizen

13   residing at all relevant times in the State of California.

14         5.    Defendant Bayerische Hypo-Und Vereinsbank AG d/b/a HVB

15   Group ("HVB Group") is a German corporation and one of the ten largest banks in the

16   world with its principal place of business located in Munich, Germany.  On information

17   and belief, it is involved in international banking and investment transactions, including

18   transactions throughout the United States, including the Northern District of California.  It

19   also purposefully directed its tax shelter activities complained of herein toward residents

20   of California and otherwise established contacts with California in participating in the

21   CARDS transactions and the Enterprise, as described below.

22         6.    Defendant HVB Structured Finance, Inc. is a corporation offering

23   banking and credit services with its principal place of business located in New York, New

24   York.  On information and belief, it is a United States affiliate of the HVB Group and

25   handles banking and financial transactions throughout the U.S., including the Northern

26   District of California. It also purposefully directed its tax shelter activities complained of

27   herein toward residents of California and otherwise established contacts with California in

28   participating in the CARDS transactions and the Enterprise, as described below.

COMPLAINT
2

1         7.     Defendant HVB America, Inc. is a corporation offering banking

2    and financial services with its principal place of business located in New York, New

3    York.  On information and belief, it is a subsidiary of the HVB Group and handles

4    banking and financial transactions throughout the U.S., including the Northern District of

5    California. It also purposefully directed its tax shelter activities complained of herein

6    toward residents of California and otherwise established contacts with California in

7    participating in the CARDS transactions and the Enterprise, as described below.

8         8.     Defendant HVB Capital Markets, Inc. is a corporation offering

9    banking and investment services with its principal place of business located in New York,

10   New York.  On information and belief, it is a division of the HVB Group and handles

11   banking and financial transactions throughout the U.S., including the Northern District of

12   California. It also purposefully directed its tax shelter activities complained of herein

13   toward residents of California and otherwise established contacts with California in

14   participating in the CARDS transactions and the Enterprise, as described below.

15        9.     Defendant HVB Risk Management Products Inc. is a Delaware

16   corporation with its principal place of business in New York, New York.  On information

17   and belief, it is an affiliate or subsidiary of HVB Group and handles banking and financial

18   transactions throughout the U.S., including the Northern District of California. It also

19   purposefully directed its tax shelter activities complained of herein toward residents of

20   California and otherwise established contacts with California in participating in the

21   CARDS transactions and the Enterprise, as described below.

22        10.     Defendant Domenick Mario DeGiorgio is an individual who, at all

23   relevant times, acted as Managing Director of the United States operations of HVB Group

24   and Vice President of the Structured Finance Group of HVB America, Inc.  At all relevant

25   times, Plaintiff is informed and believes and therefore alleges that Mr. DeGiorgio's

26   principal place of business and residence was and is in New York and that at all relevant

27   times, he transacted business within the Northern District of California.  (Hereinafter, all

28   of the HVB defendants and Mr. DeGiorgio will be referred to collectively as "HVB.")  He

1    also purposefully directed its tax shelter activities complained of herein toward residents

2    of California and otherwise established contacts with California in participating in the

3    CARDS transactions and the Enterprise, as described below.

4              11.      On information and belief, Defendant Randall S. Bickham is one of

5    the founders and directors of Skyline Advisory Services, LLC.  At all relevant times,

6    Plaintiff is informed and believes and therefore alleges that Mr. Bickham's principal place

7    of business and residence was and is in the Northern District of California, and that he

8    transacted and continues to transact business in the Northern District of California.

9              12.      On information and belief, Defendant Skyline Advisory Services,

10   LLC is a limited liability company incorporated in Nevada with its principal place of

11   business located at Menlo Park, California.  At all relevant times, Plaintiff is informed and

12   believes and therefore alleges that Skyline transacted and continues to transact business in

13   the Northern District of California. (Hereinafter, Mr. Bickham and Skyline will be

14   referred to collectively as "Skyline.")

15             13.      Plaintiff is informed and believes and therefore alleges that the

16   defendants, who along with the financial advisory and investment firm Sussex Financial

17   Enterprises, Inc. d/b/a Chenery Associates ("Chenery") and the law firms of Brown &

18   Wood LLP (as well as it successor, Sidley Austin Brown & Wood LLP, both referred to

19   as "Sidley") and LeBoeuf Lamb Greene & MacRae LLP ("LeBoeuf"), engaged in a large

20   number of tax schemes similar to the one at issue herein, and, in doing so, acted in concert

21   according to a prearranged and commonly understood and accepted plan or scheme.  In so

22   doing, Plaintiff is informed and believes and therefore alleges that the defendants were

23   acting mutually and as agents of one another, and established an ongoing organization for

24   the purpose of generating fees from their tax avoidance schemes.  Plaintiff is informed and

25   believes and therefore alleges that the various entities and individuals comprising HVB,

26   Skyline and Sidley functioned as a continuing unit, along with various co-conspirators,

27   including Chenery, LeBoeuf and Graham Taylor (referred to collectively as the "CARDS

28   promoters").

14.     Mr. Taylor is an individual who, at all relevant times, was a partner and attorney practicing tax law at the offices of LeBoeuf Lamb Greene & MacRae LLP's office located in the City and County of San Francisco, California, and was acting with the authority of LeBoeuf. Mr. Taylor and LeBoeuf will be referred to collectively herein as "LeBoeuf."

15.     The CARDS promoters had a decision-making structure by which they formulated and determined how to promote their tax schemes, including the CARDS Facility. Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does ONE through THIRTY. Plaintiff will amend his complaint by asserting their true names, capacities and appropriate charging allegations when they are ascertained.

## GENERAL ALLEGATIONS

16.     Plaintiff brings this action, seeking compensatory damages according to proof, trebled under RICO, and related relief, against HVB and Skyline and for their role in promoting and implementing numerous tax strategies that the federal government has found to be unregistered tax shelters, including one known as the "CARDS facility," and inducing Plaintiff to utilize the CARDS facility tax strategy and file tax returns premised on the assumption that the strategy was lawful. CARDS has been rejected by federal and state tax agencies, as the Defendants knew it would be.

17.     Plaintiff is informed and believes and therefore alleges that in or about 1999, or earlier, the defendants entered into an arrangement to market and promote various fraudulent tax strategies, one of which was dubbed the CARDS facility, in order to generate huge fees. The defendants arranged for financial advisory and investment firms, including myCFO, Inc. ("myCFO") Chenery, to identify and then solicit potential participants, like Plaintiff, who was induced to engage in CARDS and pay the defendants large fees by misrepresentations and legal advice that the defendants knew were improper and not disinterested.

18.     On information and belief, the CARDS facility was first conceived
by Chenery in San Francisco, California, with Mr. Ruble, acting at all times with the
authority of and on behalf of Sidley, helping design and revise the structure through
telephone calls and exchanges of correspondence by facsimile and/or electronic mail sent
to Chenery in San Francisco, California.  On information and belief, the banks with whom
the CARDS transactions were sold – Deutsche Bank AG d/b/a Banker's Trust and
Deutsche Bank Securities, Inc. (together, "Deutsche Bank") and HVB – also helped refine
and design the structure of the CARDS transactions.  On information and belief, these
banks dealt primarily with Chenery, located in San Francisco, California, as well as
myCFO, whose principal office was located in Redwood City, California.

19.     Mr. Rezner does not have any background in tax law or accounting
and has always relied upon professional representation in determining his tax obligations.

20.     In 1999, Plaintiff is informed and believes and therefore alleges that
a Silicon-Valley based company called myCFO began advertising "integrated" financial
services for "high-net worth individuals" such as Mr. Rezner.  myCFO offered to provide
"clarity and simplicity for [a client's] complex financial life," by offering a full range of
financial services, from tax structuring, planning and compliance to estate planning,
accounting, investment planning and management, bill paying services, personal
management support, and legal and financial record-keeping.  myCFO advertised that,
"[a]s a result, [a client] can avoid spending time on the all-consuming financial details,"
by allowing myCFO to handle all aspects of a client's financial life, including divergent
areas of financial or tax planning that were traditionally handled by separate, independent
advisers.

21.     After becoming aware of such advertising, Mr. Rezner hired
myCFO to handle certain of his financial, tax and investment planning.  myCFO
subsequently began providing financial, investment and tax planning to Mr. Rezner, and
Plaintiff relied heavily on such planning and advice.

22.     In or about summer of 2001, myCFO advised Mr. Rezner to

1    participate in a plan called the "CARDS facility," a custom adjustable rate debt financing

2    plan.  On information and belief, the CARDS facility was described to Mr. Rezner by

3    HVB through documentation and through representations made by HVB officers and

4    employees to Chenery and myCFO, acting then as an agents for Mr. Rezner, as an

5    interest-free line of credit against which he could borrow to make other investments.  Mr.

6    Rezner was also informed by LeBoeuf and Sidley, through opinion letters and

7    representations made to Chenery and myCFO, acting then as agents for Mr. Rezner, that

8    the structuring of this line of credit gave it certain tax advantages.  The CARDS facility

9    was described to Mr. Rezner by LeBoeuf and Sidley as a sound transaction that was

10   completely legal for income tax purposes.  Plaintiff, however, is informed and believes

11   that he was not, in fact, able to obtain a line of credit or a loan, that he did wind up having

12   to pay interest and other fees, and that he was misinformed and misled about the nature

13   and soundness of the CARDS facility.

14          23.    In fact, the CARDS facility was nothing more than a sham

15   transaction designed by the defendants to "create" paper capital losses to offset capital

16   gains for income tax purposes, and Plaintiff is informed and believes and therefore alleges

17   that all of the defendants knew that the CARDS facility was a sham transaction that would

18   not generate any profits and would not be recognized by federal or state taxing authorities

19   for income tax purposes.

20          24.    The CARDS facility was structured as follows: First, a single

21   purpose limited liability company ("LLC") would be organized in Delaware.  The LLC

22   would enter into a credit agreement with HVB, which would make available to the LLC a

23   long-term loan denominated in foreign currency, the amount of the loan being determined

24   by the amount of loss that needed to be generated for the taxpayer.  The loan would

25   require annual interest payments, but was to be paid in lump sum at the end of a 30 year

26   term.  The LLC would then use 80-85% of the loan principal to acquire bank deposits in

27   the same foreign currency as the loan, which would then be placed on account with the

28   bank and become security for the loan, as well as the primary source for repayment of that

1  portion of the loan.  The LLC would draw the remaining 15-20% of the loan proceeds to

2  acquire bank obligations from the bank, which would become additional security for the

3  loan and be the first source of repayment for the balance of the loan. As part of the

4  transaction, the taxpayer would purportedly purchase from the LLC, the 15-20% of the

5  loan proceeds which were standing as security. At the same time, the taxpayer assumed

6  joint and several liability to the bank for repayment of the loan's entire principal and

7  accrued interest at term.  Since all of the proceeds of the loan remained as security at the

8  bank for the sole source of repayment of the loan, the taxpayer bore no appreciable risk.

9  Under the assumption agreement the taxpayer could substitute his capital for the

10  purchased funds in order to free them for sale.  The taxpayer would then sell at cost to a

11  third party all or a portion of the 15-20% of the loan proceeds that he had just purchased.

12  There were no securities involved in the transaction, and the "loan" was always fully, and

13  even over, collaterized.  Collateral for the loan was in the form of cash or cash equivalent.

14       25.    Plaintiff is informed and believes that HVB acted as the third party

15  purchaser in order to create the appearance of a taxable transaction.  HVB would also

16  document the transaction as if it were a legitimate sale.  Because the taxpayer was

17  supposedly liable for the entire loan amount, he would claim a tax basis loss in proportion

18  to the entire loan principal,  thereby offsetting capital gains on a scale commensurate with

19  the risk involved or the capital expended.   In fact, the entire transaction was an elaborate

20  sham. While the loan was represented to be a revolving line of credit, it in fact could only

21  be drawn once.  No credit whatsoever was actually available to the taxpayer.

22       26.    Plaintiff is informed and believes and therefore alleges that Roy

23  Hahn, one of the founders and a principal of Chenery, developed and promoted the

24  CARDS facility in San Francisco, California, with the assistance of Graham Taylor from

25  LeBoeuf's San Francisco office; HVB, and Sidley, including R.J. Ruble, a partner and

26  attorney of Sidley.  Plaintiff is informed and believes and therefore alleges that said

27  founders met on numerous occasions, with officers of HVB in order to develop and refine

28  the scheme and its tax related attributes, including but not limited to meetings with

1   Domenick DeGiorgio, Bill Tsai, Richard Pankuch and Sylvia Demetrio, all of whom were

2   officers and representatives of HVB and had substantial and essential roles in the

3   transactions.  At the meetings with HVB, Plaintiff is informed and believes and therefore

4   alleges that HVB assisted in formulating the manner in which a taxable event would be

5   created and a method by which HVB promissory notes would be utilized for the purpose

6   of creating capital assets that could be purportedly sold at a loss so that a large tax benefit

7   could be claimed on behalf of the taxpayers who participated in the program.  On

8   information and belief, HVB sold CARDS programs to 20-30 different clients and

9   purposefully directed its tax shelter activities complained of herein toward residents of

10   California through Chenery and myCFO, both of whom were based in the Northern

11   District of California, knowing that the fraudulent tax shelters would have an impact on

12   the CARDS clients' state tax returns, as well as federal tax returns.

13       27.     The CARDS facility was promoted to individuals throughout

14   California, including Mr. Rezner, by telling them that the nationally renowned and

15   prestigious law firms of Sidley and LeBoeuf had already reviewed the transaction and

16   would provide opinion letters "blessing" the CARDS facility and confirming that the tax

17   advantages would be recognized by the Internal Revenue Service ("IRS") for income tax

18   purposes.

19       28.     LeBoeuf, which holds itself out as one of the world's leading law

20   firms, and Graham Taylor, who was then an attorney and partner with LeBoeuf

21   specializing in tax law, provided opinion letters from its San Francisco office

22   summarizing the CARDS facility and assessing the potential tax consequences of the

23   CARDS facility.  Plaintiff is informed and believes and therefore alleges that these

24   opinion letters, although purporting to be issued on behalf of the taxpayer as a client,

25   were, in actuality, boilerplate letters that were generated in identical form and substance to

26   numerous other clients of the CARDS facility.  Plaintiff is informed and believes and

27   therefore alleges that Graham Taylor knew that, in fact, the CARDS facility would not be

28   likely to be recognized for income tax purposes by federal and state taxing authorities, and

COMPLAINT
9

1   that because of the CARDS promoters' financial interest in the CARDS facility

2   transaction sold to Plaintiff, Plaintiff would not be able to rely on the opinion letters of

3   Sidley or LeBoeuf for income tax purposes, including reasonable reliance for penalties.

4         29.     Plaintiff is informed and believes and therefore alleges that

5   LeBoeuf charged each taxpayer a flat fee, as opposed to an hourly fee, for providing the

6   opinion letters. Plaintiff is informed and believes and therefore alleges that, since the

7   opinion letters were merely reproduced in identical form for each taxpayer that

8   participated in the CARDS facility, the provision of opinion letters for the CARDS

9   transactions were a substantial source of revenue to LeBoeuf and Graham Taylor, and that

10   Graham Taylor actively participated in the marketing, promotion, development and

11   facilitation of the CARDS scheme. Plaintiff is informed and believes and therefore

12   alleges that the CARDS promoters were all aware of Graham Taylor's vested interest in

13   the promotion of the CARDS facility.

14         30.     Plaintiff is informed and believes and therefore alleges that, like the

15   LeBoeuf letters, the opinion letters issued by Sidley, although purporting to be issued on

16   behalf of the taxpayer as a client, were, in actuality, boilerplate letters that were generated

17   in identical form and substance to numerous other clients of the CARDS facility and

18   similar artificial basis transactions. Plaintiff is informed and believes and therefore alleges

19   that an attorney named R.J. Ruble, who was then a partner at Sidley, provided or helped to

20   provide the Sidley opinion letter and helped develop, promote and facilitate the CARDS

21   transaction, acting at all times on behalf of Sidley. Plaintiff is informed and believes and

22   therefore alleges that Sidley was paid a flat fee or fee based on the size of the CARDS

23   transaction, as opposed to an hourly fee, for providing the opinion letters in the amount of

24   $250,000 per letter. Plaintiff is informed and believes and therefore alleges that, since the

25   opinion letters were merely reproduced in identical form for each taxpayer that

26   participated in the CARDS facility, the provision of opinion letters for the CARDS

27   transactions were a substantial source of revenue to Sidley, and that Sidley actively

28   participated in the marketing, promotion and facilitation of the CARDS scheme. Plaintiff

1  is informed and believes and therefore alleges that the CARDS promoters were all aware

2  of Sidley's vested interest in the promotion of the CARDS facility.

3      31.    Mr. Ruble also entered into a license agreement with Chenery dated

4  May 19, 1998, which referred to the "CARDS facility" as a "proprietary technology that

5  potentially yields users who purchase assets certain tax, financial, accounting or other

6  commercial benefits."  Mr. Ruble, acting on behalf of Sidley, agreed to "license" the

7  CARDS "technology" to Chenery to exploit on a worldwide basis for a period of 48

8  months in exchange for the payment of 20% of all fees paid to Chenery.  The 20% share

9  would be paid as an "under the table" kickback fee for each CARDS transaction to Family

10  Investment Statutory Trust, a personal trust created for the benefit of Mr. Ruble.  On

11  information and belief, Sidley was aware or should have been aware of this licensing

12  agreement, yet none of the defendants ever disclosed the existence of this or its obvious

13  conflict of interest to Mr. Rezner.

14      32.    Based upon the advice and promotional efforts of the CARDS

15  promoters, and the opinion letters, draft opinions and advice provided in 2001 and 2002

16  by LeBoeuf and Sidley, Mr. Rezner signed, or caused to be signed, the boilerplate

17  documentation presented to him in connection with the CARDS facility.  At no time did

18  any of the defendants or CARDS promoters ever disclose to Mr. Rezner that they were

19  jointly active in promoting, marketing, developing and/or facilitating the CARDS facility,

20  nor did anyone ever disclose to Mr. Rezner that the Sidley and LeBoeuf opinion letters

21  were simply form letters that had been mass-generated for each taxpayer that participated

22  in the CARDS facility.

23      33.    As a result, the CARDS promoters conducted on Mr. Rezner's

24  behalf multiple CARDS facility transactions:  transaction(s) on or about September 18,

25  2001 that resulted in alleged capital losses for that income tax year; transaction(s) on or

26  about September 19, 2001 that resulted in alleged capital losses for that income tax year;

27  and transaction(s) and a closing of the facility in or about 2002 that resulted in alleged

28  capital carry-over losses for that income tax year.

1        34.    HVB acted as the "lender" for each of these transactions, and the

2   LLC for Mr. Rezner's CARDS facility was called Pinner Financial Trading LLC

3   ("Pinner").

4        35.    myCFO subsequently prepared and submitted to the IRS and

5   Franchise Tax Board of the State of California tax returns, claiming a tax basis based upon

6   the adjusted cost basis of the sold portions of the promissory note.  For tax year 2001,

7   myCFO recorded a short-term capital loss of $39,649,866, the difference between the

8   adjusted cost basis in the sold portion of the promissory note of $46,946,000 and the

9   $7,296,134 proceeds Mr. Rezner received from the September 2001 sales.

10       36.    Mr. Rezner received draft and final opinion letters from Sidley and

11  LeBoeuf in support of the legitimacy of the above CARDS transaction as a means of

12  declaring the aforementioned capital losses.  The letters also confirmed that Mr. Rezner

13  would be legally entitled to declare for tax purposes the capital losses from the CARDS

14  facility and offset capital gains on his tax returns and not receive penalties therefrom.  In

15  the opinion letters, which were addressed directly to Mr. Rezner, the law firms purported

16  to be acting as counsel for Mr. Rezner on his behalf in providing their opinions.  At no

17  time did any of the attorneys or law firms, or any other parties, disclose to Mr. Rezner that

18  the law firms were retained and/or jointly working with the other CARDS promoters to

19  develop and promote the CARDS transaction that was the basis of the opinion letters, and

20  were therefore not providing independent advice.  Nor did Graham Taylor ever disclose to

21  Mr. Rezner the extent of his conflict of interest in having represented Chenery and

22  myCFO, Inc. during their creation and/or development of the CARDS facility directly

23  before having undertaken the representation of Mr. Rezner.  Sidley also failed to disclose

24  that it was being induced to provide a favorable opinion of CARDS based upon the under

25  the table kickback fees paid to Mr. Ruble's personal trust by Chenery for each

26  "successful" CARDS transaction pursuant to the May 1998 licensing agreement.

27       37.    Not including additional sums that were paid for investment

28  advisory services and other financial planning services to myCFO, Plaintiff is informed

1    and believes and therefore alleges that the CARDS promoters caused payments to be

2    made to themselves of approximately $3 million for their work in arranging and effecting

3    the CARDS transactions.

4           38.    Mr. Rezner reasonably relied on the tax advice, legal advice and

5    professional services rendered by the CARDS promoters.

6           39.    The CARDS promoters knew and/or recklessly disregarded at the

7    time LeBoeuf and Sidley issued their opinion letters, and in developing, promoting and

8    facilitating the CARDS facility, that the CARDS transaction constituted a tax shelter

9    within the meaning of Code Section 6111(c)(1), and that they were illegally promoting,

10   and aiding and abetting the promotion, of an unregistered tax shelter.  The CARDS

11   promoters also knew and/or recklessly disregarded the impropriety of their promotion and

12   facilitation of the CARDS facility, by providing statements concerning the allowability of

13   any tax benefit obtained through participation in the CARDS facility even though

14   defendants knew or had reason to know such statements were false, and by facilitating or

15   providing a gross valuation overstatement concerning the tax and investment benefits of

16   the CARDS facility, constituted a violation of I.R.C. § 6700.

17          40.    Unbeknownst to Plaintiff at the time that he had entered into the

18   CARDS facility transactions, the defendants and CARDS promoters have also been

19   involved in the development, creation and promotion of numerous other illegal or abusive

20   tax shelters, including schemes known as ZENS, NPL, BOSS, Son-of-Boss, BLIPS,

21   MIDCO, FLIPS, OPIS, TRACT, IDV and COBRA.  On information and belief, each of

22   these tax strategies was the same as or substantially similar to "listed transactions,"

23   transactions that are subject to the list maintenance requirements of Internal Revenue

24   Code § 6111 because they have the potential for tax avoidance or evasion, listed in IRS

25   regulations or notices.  Each should have been registered as tax shelters pursuant to

26   Internal Revenue Code § 6111(c), but the defendants did not register them.

27          41.    Prior to the time that the CARDS facility was promoted to Plaintiff,

28   the IRS had issued Notice 1999-59, published on or about December 27, 1999, entitled

1    "Tax Avoidance Using Distributions of Encumbered Property," and warning that the IRS

2    had become aware of certain types of transactions "being marketed to taxpayers for the

3    purpose of generating tax losses."  IRS Notice 1999-59 warned that such transactions

4    consisted of a "contrived series of steps" by which "taxpayers claim tax losses for capital

5    outlays that they have in fact recovered."  IRS Notice 1999-59 stated that such "artificial

6    losses" are not allowable for federal income tax purposes.

7            42.    On or about September 5, 2000, the IRS published Notice 2000-44,

8    entitled "Tax Avoidance Using Artificially High Basis," addressing similar transactions to

9    Notice 1999-59.  Notice 2000-44 described a similar inflated basis transaction, concluding

10    that "purported losses from these transactions (and from any similar arrangements

11    designed to produce noneconomic tax losses by artificially overstating basis . . . ) are not

12    allowable as deductions for federal income tax purposes."

13            43.    In December 2000, there was published an article by Lee Sheppard

14    entitled "The Synthetic Euro Borrowing Tax Shelter" exposing the CARDS facility and

15    concluding that CARDS transactions did not have any economic substance for income tax

16    recognition purposes.  On information and belief, the CARDS promoters were specifically

17    aware of the Sheppard article by late 2000 or early 2001, well before they closed or

18    caused to be closed the first CARDS facility transaction for Plaintiff, but closed his

19    transaction anyway.

20            44.    As a result of IRS Notices 1999-59 and 2000-44, both of which

21    were issued prior to the opinion letters and agreement to enter into the Rezner CARDS

22    transaction, as well as the Sheppard article, the CARDS promoters knew or should have

23    known that the CARDS transaction was not a legitimate or legal means for declaring

24    capital losses for income tax purposes for Rezner.  Nevertheless, the defendants failed to

25    inform Rezner of the illegality of the CARDS tax shelter scheme and, in fact, advised, and

26    aided and abetted in providing advice, to the contrary.  The CARDS promoters also knew

27    or should have known that their promotion and facilitation of the CARDS facility, by

28    providing statements concerning the allowability of any tax benefit obtained through

1   participation in the CARDS facility even though defendants knew or had reason to know

2   such statements were false, and by facilitating or providing a gross valuation

3   overstatement concerning the tax and investment benefits of the CARDS facility,

4   constituted a violation of I.R.C. § 6700.

5         45.    On or about March 18, 2002, the IRS issued Notice 2002-21,

6   entitled "Tax Avoidance Using Inflated Basis," describing the CARDS transaction and

7   listing it as a tax shelter, or transaction that is "not allowable for federal income tax

8   purposes."   On or about October 15, 2004, the IRS issued a Coordinated Issue Paper on

9   the CARDS facility, concluding again that it was a sham transaction that is not allowable

10   for federal income tax purposes.

11         46.    Despite this, Plaintiff is informed and believes and therefore alleges

12   that the defendants communicated with Plaintiff and/or his agents through 2002 and/or

13   2003 in an attempt to discourage him and other CARDS facility clients from holding them

14   liable for their fraudulent tax shelter scheme, and attempting to conceal the full extent of

15   racketeering activity by the defendants and lack of business purpose, illegality, and lack of

16   disinterest by Sidley and LeBoeuf relating to the CARDS facility transactions.

17         47.    Plaintiff's 2001 tax returns have since been audited by the IRS,

18   with the IRS taking the position that the declared capital losses from the CARDS facility

19   are not allowable for income tax purposes.  The State of California Franchise Tax Board

20   has also disallowed the use of capital losses from the CARDS Facility for state income tax

21   purposes.  On information and belief, the defendants knew and anticipated that the

22   fraudulent tax shelters that they participated in, including the CARDS Facility, would

23   have an impact on federal as well as state – California – tax returns, depriving those

24   governments of substantial revenues.

25         48.    Plaintiff is informed and believes and therefore alleges that the

26   CARDS promoters jointly developed, marketed, promoted, and/or facilitated the CARDS

27   facility for the express purpose of receiving and splitting millions of dollars in fees.

28   Plaintiff is informed and believes and therefore alleges the receipt of those fees was the

1    sole motive in the development, marketing, promotion, facilitation and execution of the

2    CARDS facility scheme.  Plaintiff is informed and believes and therefore alleges that in

3    jointly developing, marketing, promoting and/or facilitating the CARDS transaction, the

4    CARDS promoters agreed that they would issue advice and opinion letters as to the

5    lawfulness and tax consequences of the CARDS facility, so as to collect fees from the

6    CARDS transactions, even though Plaintiff is informed and believes and therefore alleges

7    that defendants knew, at the time that the CARDS facility was promoted to Plaintiff, that

8    it was not a legitimate transaction for income tax purposes.  The opinion letters and advice

9    offered to Plaintiff by the defendants were not, therefore, "independent," insofar as the

10   same advice and "form" opinion letters were issued to numerous other clients for purposes

11   of soliciting and collecting fees from the CARDS transactions.  Plaintiff is informed and

12   believes and therefore alleges that the receipt of fees and the pecuniary gain from those

13   fees was the sole motive for defendants' conduct, as alleged herein.  Plaintiff is informed

14   and believes and therefore alleges that this arrangement to develop and promote the

15   CARDS facility gave each of the participating defendants a significant pecuniary interest

16   in the advice and professional services that they rendered to Plaintiff, impairing the

17   exercise of the judgment and duty of care, loyalty and honesty that each CARDS promoter

18   and defendant owed to Rezner.

19           49.     Plaintiff is informed and believes and therefore alleges that since at

20   least 1999 and continuing through at least 2002, Sidley and Graham Taylor, using

21   interstate mail, issued numerous boilerplate opinion letters to clients involving numerous

22   CARDS facility tax shelters. Plaintiff is informed and believes and therefore alleges that

23   HVB also caused wire transfers to be made in that same time period related to the CARDS

24   facility, which were instrumental to the CARDS facility.  Plaintiff is informed and

25   believes and therefore alleges that the other CARDS promoters also used interstate mail

26   and wire transfers to facilitate, implement and/or promote numerous CARDS facility

27   transactions, from which they made millions and millions of dollars in fees. Plaintiff is

28   informed and believes and therefore alleges that Skyline intentionally provided false

1    information about the impact of IRS Notice 2002-21 so as to discourage him from making

2    any claims against any of the defendants, and that Skyline used interstate mail to

3    communicate with the other defendants for this purpose, as well as to communicate with

4    Plaintiff and the other CARDS clients.  Plaintiff is informed and believes and therefore

5    alleges that the fees paid to all of the CARDS facility promoters were received using

6    interstate mail and wire facilities.

7           50.    HVB and Skyline have, on information and belief, cloaked the

8    identity of the clients receiving the aforementioned opinion letters in privilege and

9    confidentiality claims. Similarly, they have masked their use of the interstate mail and

10   wire facilities and their fraudulent conduct in similar claims.

11          51.    Plaintiff is informed and believes and therefore alleges that, under

12   the defendants' arrangement, the role of HVB included planning the structure to be used

13   in the sham transactions, providing purported financing to enable persons to participate in

14   tax shelters, including the making of fictitious loans to newly formed shell companies,

15   which had neither the capital nor the ability to service such loans, as a platform and

16   vehicle for the perpetration of the scheme on numerous persons who had potentially large

17   tax obligations which would have to be paid to the Internal Revenue Service and to the

18   State taxing authorities, depending on the location of the particular taxpayers.  On

19   information and belief, HVB provided hundreds of millions of dollars for sham "loan"

20   transactions for the CARDS facility tax shelters alone, not including other tax shelters in

21   which it participated, including BLIPS, in which it used Deutsche Bank's transactional

22   documents as a model for that tax shelter.  HVB's role also included providing a facade of

23   financial substance and purported third party sales so that the taxpayers could purport to

24   generate huge income tax losses, none of which would be the product of legitimate sales

25   or taxable events.  HVB's role assisted in structuring the transactions so that they had a

26   semblance of economic reality but, as HVB knew, and as one of its principal officers has

27   admitted under oath in pleading guilty to a conspiracy to defraud the IRS with other

28   fraudulent tax shelter transactions, the CARDS facility transactions were a complete

1    sham.  On information and belief, HVB also served as the counter-party or third party

2    purchaser, or facilitated such, on numerous transactions in which it engaged in order to

3    implement those shelters.

4          52.    Defendant Randall S. Bickham is an individual who worked with

5    KPMG on various fraudulent tax shelters, including BLIPS, ZENS, NPL, BOSS, Son-of-

6    Boss, MIDCO, FLIPS, OPIS, TRACT, IDV and COBRA, which were done with HVB.

7    He joined myCFO, Inc. in or about spring 2002 for the purpose of bringing in additional

8    tax shelter clients for myCFO.  When myCFO sold most of its assets on or about

9    November 1, 2002 to Harris myCFO, Inc., with STARS Holding Co. succeeding and

10   retaining myCFO's former tax shelter division, the STARS Group, Mr. Bickham left

11   myCFO and formed his own company, Skyline.  Skyline purported to provide former

12   myCFO clients with ongoing tax audit assistance, but in reality, it existed solely to

13   conceal from these former myCFO clients the gravity and nature of the tax shelters that

14   had been sold to them. Skyline even offered to liaison on behalf of the clients with the IRS

15   in order to limit or prevent information from being provided to the IRS.  In this manner,

16   Skyline hoped to prevent taxpayers from asserting any claims against it, myCFO or any of

17   the other CARDS promoters for the tax shelters that had been sold to them.  For these

18   "services," myCFO paid approximately $1.4 million to Mr. Bickham prior to selling its

19   assets.  This payment left the successor, STARS Holding Company, bereft of assets and

20   succeeded in fraudulently concealing from the clients the true nature of the shelter and its

21   lack of merit.  As such, Mr. Bickham and Skyline participated directly in the Enterprise

22   and succeeded in covering up the Enterprise that had been previously formed by the other

23   defendants and concealing the fraudulent nature of its operations.

24          53.    Defendants specifically advised Plaintiff that IRS Notice 2002-21

25   was not a final assessment or finding that his own CARDS transaction was invalid.  In

26   fact, Plaintiff was told that "the opinion writers [Sidley and LeBoeuf] continue to stand by

27   their opinions" that had blessed the legitimacy of the CARDS facility for income tax

28   purposes.  Plaintiff was also assured by myCFO, Chenery (along with its then counsel,

1    McDermott Will & Emery) and Skyline that they would initiate a "joint defense" fund that

2    he should join.  That joint defense fund was described to Plaintiff as one that would take a

3    "test case" and file litigation against the IRS, challenging its listing of the CARDS

4    facility.  On information and belief, Skyline and Mr. Bickham continued to work closely

5    with the other CARDS promoters on this joint defense fund.  In reality, the joint defense

6    fund was nothing more than an attempt to reassure the CARDS clients and prevent them

7    from filing any claims against the defendants until the statute of limitations had run.

8    Based upon the false representations made to Mr. Rezner about this joint defense fund, he

9    contributed funds to it, not realizing that it was merely an attempt to discourage CARDS

10   clients from asserting claims against the defendants until after the expiration of the statute

11   of limitations.  As a result of this, Plaintiff did not know or have reason to suspect that any

12   wrongdoing had been committed in conjunction with his CARDS facility, including by

13   defendants, until the recent indictments of Mr. DeGiorgio and Mr. Bickham in

14   conjunction with other tax shelters, and the statement of admitted facts and deferred

15   criminal prosecution agreement of HVB dated February 13, 2006 in which HVB admitted

16   wrongdoing in conjunction with the CARDS facility.

17          54.    After the IRS issued IRS Notice 1999-59 and Notice 2000-44, the

18   CARDS promoters continued marketing, promoting, facilitating and participating in such

19   tax shelter sham programs, including CARDS and others that were devised by them as

20   part of the defendants' arrangement, that fell within the scope of those notices and rulings.

21   On information and belief, the CARDS promoters used the interstate mail and wire

22   facilities to promote and market these tax shelters, to send their opinion letters and other

23   communications, and to collect fees.  The defendants' actions described herein pose the

24   threat of continuing criminal activity, as they have continued their promotion of listed tax

25   shelters even after IRS Notices questioning the shelters and/or similar transactions.  On

26   information and belief, the defendants' arrangements succeeded in generating many

27   millions and millions of dollars in sham tax losses for dozens or more clients and

28   taxpayers, causing those clients and taxpayers substantial damage and depriving the

1    United States of millions of dollars in tax revenues.

2        55.    The defendants intentionally masked their arrangement and

3 activities in the cloak of attorney-client privilege.  They and their fellow participants

4 corresponded and communicated with each other as clients individually and collectively

5 so that the taxpayer clients would not know who else was participating in the shelters and

6 could not know the deceptive nature and scope of the defendants' arrangements.

7        56.    Those who were involved in this CARDS scheme have now been

8 investigated and are being criminally indicted for their role in other fraudulent tax

9 shelters.  Mr. Rezner was never informed about any of the defendants' history with prior

10 fraudulent tax shelters.

11        57.    The United States Senate Subcommittee studying tax shelters

12 concluded that HVB "provided billions of dollars in lending critical to transactions which

13 the banks knew were tax motivated, involved little or no credit risk, and facilitated

14 potentially abusive or illegal tax shelters . . ." Final Report, p. 7, 111.  All of these HVB

15 tax shelter transactions involved boilerplate opinion letters, like the ones given to Plaintiff.

16 Final Report, p. 55-56.  This included numerous BLIPS transactions, which were

17 predicate acts for the CARDS transaction sold to Mr. Rezner, as well as numerous other

18 CARDS transactions, which were also predicate acts for the sale of the CARDS facility to

19 Plaintiff.  In 1999 and 2000, HVB did 29 BLIPS transactions, providing "credit lines" that

20 totaled about $2.5 billion.  HVB received $5.45 million for BLIPS transactions in less

21 than 3 months in 1999, according to documents that it produced to the Senate.  Senate

22 Report, p. 112, HVB credit request dated January 6, 2000, Bates HVB 003320-30.

23        58.    Mr. DeGiorgio, the Directing Manager of the U.S. branch of HVB

24 Group and an officer of HVB, waived indictment and pled guilty on August 11, 2005 to

25 four counts of illegal conduct, including "participating in a conspiracy to defraud the

26 Internal Revenue Service involving tax shelter transactions promoted by and participated

27 in by [his] employer, Hypo und Vereinsban, HVB, including the tax shelter known as

28 BLIPS." (*United States v. DeGiorgio*, S.D.N.Y. 05-CR-853 BSJ).  He also pled guilty to

1    another federal conspiracy statute for "participation in a conspiracy to defraud the IRS

2    involving the payment to various participants in tax shelter transactions of compensation

3    that was obtained through and as a result of certain tax shelter transactions involving HVB

4    and which compensation was not reported to the IRS by certain recipients and payors of

5    the compensation."

6              59.    Mr. DeGiorgio testified that he was employed by HVB from 1996

7    to 2003, during which time, he participated in the sale of numerous BLIPS transactions,

8    which he understood to "help wealthy clients of the BLIPS promoters to significantly

9    reduce their tax liability to the United States Internal Revenue Service." Mr. DeGiorgio

10   also described in his testimony how BLIPS was structured and that, like CARDS, it

11   involved "creating reported tax losses [based] on the bank purporting to provide a loan

12   structured in a particular way." Mr. DeGiorgio testified that "[t]he loan proposed by the

13   BLIPS promoters was a sham because, among other things, as designed, no money ever

14   left the bank and because HVB never set aside any of its own money or procured funds

15   from the banking market in order to fund any of these loans." Mr. DeGiorgio testified that

16   he was aware of these facts and aware that the supporting opinion letters drafted by the

17   same attorney at Sidley, R.J. Ruble, that was involved in Plaintiff's CARDS transaction,

18   "falsely described [ ] these purported loans. . ." Mr. DeGiorgio further testified that he

19   and others caused HVB "to prepare and execute various false documents that made it

20   appear that HVB was providing real loans when in reality it was not." Mr. DeGiorgio also

21   testified to several other "false and misleading aspects of BLIPS that [he] recognized to be

22   false and misleading at the time," including the illusion that it was a long-term program

23   and the fact that it had no real investment or leveraged aspects. For his work on these

24   fraudulent tax shelters, Mr. DeGiorgio testified that he received undeclared compensation

25   from an unidentified tax shelter promoter based in California.

26             60.    Both attorneys that provided opinion letters to Mr. Rezner and

27   numerous other taxpayers "blessing" the CARDS Facility, R.J. Ruble of Sidley and

28   Graham Taylor of LeBoeuf, have also been indicted for their role in devising, marketing

1    and implementing fraudulent and illegal tax shelters.  Mr. Ruble was indicted by the

2    Department of Justice, United States Attorney for the Southern District of New York

3    (*United States v. Stein, et al.*, S.D.N.Y. 05-CR 888 LAK), and Mr. Taylor was indicted by

4    the Department of Justice, United States Attorney of Utah (*United States v. Evanson, et*

5    *al.*, D. Utah 05-CR-805 TC).  Neither ever disclosed to Mr. Rezner their role in other

6    fraudulent tax shelters prior to the CARDS facility.

7         61.    On information and belief, Mr. Ruble was terminated as a partner

8    from Sidley in or about October 2003 for breaches of fiduciary duty.  Prior to that time,

9    Mr. Ruble was a partner at Sidley and member of the firm's Executive Committee.  On or

10   about November 20, 2003, Mr. Ruble was called to testify before the United States Senate

11   Subcommittee investigating tax shelters.  Mr. Ruble invoked his Fifth Amendment right

12   against self-incrimination and declined to testify.

13        62.    Mr. Bickham has also been indicted in a superseding indictment to

14   the same indictment naming R.J. Ruble of Sidley (*United States v. Stein, et al.*, S.D.N.Y.

15   05-CR-888 LAK) for his role in helping to promote and devise fraudulent tax shelters.

16        63.    The indictment naming Mr. Bickham and Mr. Ruble also identifies

17   several banks that participated in certain of the named, fraudulent tax shelters, including

18   "a foreign bank with its principal United States branch located in New York, New

19   York. . ."  Plaintiff is informed and believes and therefore alleges that one of the banks

20   described in the indictment is none other than HVB.  The tax shelters described in the

21   indictment and superseding indictment are some of the same fraudulent tax shelters

22   already named as predicate acts of the defendants in this complaint, including BLIPS.

23   HVB was already identified by the U.S. Senate Report on Tax Shelters as a bank that

24   participated in and was instrumental to these tax shelters.

25        64.    According to the superseding indictment's description of the banks'

26   involvement, the BLIPS tax shelter, for example, involved "a series of pre-arranged

27   transactions that involved the client purportedly borrowing money from one of four banks

28   . . . . in order to make purported foreign currency investments including currencies that

1  were 'pegged' to the United States dollar.  The bank involved in the purported loan also

2  served as the counterparty on all of the purported currency and other transactions . . .."

3  (*United States v. Stein, et al.*, S.D.N.Y. 05-CR-888 LAK, pp. 17-18)

4          65.     The indictment goes on to describe, consistent with Mr.

5  DeGiorgio's testimony, how the BLIPS transactions    ". . . were shams – no money ever

6  left the bank and none of the banks assigned any capital cost to these purported BLIPS

7  loans.  Indeed, at least two of the banks did not fund the loans at all – they neither set

8  aside from their own funds nor obtained from the market any money to cover these

9  purported 'loans' and 'loan premiums.'  In addition the sham loans were not in any way

10  used in the purported 'investment' program involving trades relating to pegged currencies

11  but, instead, were used only to generate a phony tax loss.  The only money used in making

12  and securing the trades involving pegged currencies as part of BLIPS was money

13  contributed by the client as part of the 7% all in cost."  Plaintiff is informed and believes

14  and therefore alleges that one of the banks referred to in the superseding indictment that

15  participated in the sham loans is HVB, and that the conduct described here, in the Senate

16  Report and in Mr. DeGiorgio's testimony is similar to the sham nature of the CARDS

17  Facility transactions executed by HVB and LeBoeuf.

18

19                      **FIRST CAUSE OF ACTION**

20                             **RICO**

21                      **(Against All Defendants)**

22          66.     Plaintiff reasserts and incorporates by reference all of the foregoing

23  allegations in their entirety and further alleges:

24          67.     The defendants' arrangement described herein constitutes an

25  ongoing organization, with an ascertainable structure and purpose beyond the predicate

26  acts and the conspiracy to commit such acts, by which the defendants function as a

27  continuing unit comprised of said defendants.

28          68.     The defendants associated themselves with each other to form an

1   ongoing organization and enterprise (the "Enterprise") for the purpose of promoting and

2   selling various tax schemes for many millions of dollars.  The defendants knew that many

3   of these tax schemes in which they developed and promoted with the help of co-

4   conspirators, including ZENS, NPL, BOSS, Son-of-Boss, BLIPS, MIDCO, FLIPS, OPIS,

5   TRACT, IDV and COBRA, and the CARDS scheme set forth above, were likely to be

6   challenged by the tax authorities and/or contrary to law.  The defendants and Enterprise

7   engaged in, and its activities affected, interstate commerce, including the provision of

8   legal, accounting, tax, financial and investment services across state lines.

9          69.     The defendants conducted or participated in the conduct of the

10  Enterprise's affairs through a pattern of racketeering activity consisting of, *inter alia*,

11  more than two acts of mail fraud, wire fraud and engaging in monetary transactions in

12  property derived from specified unlawful activity (in violation of 18 U.S.C. §§ 1341, 1343

13  and 1956, respectively).   As part of this pattern, continuing over the course of years, by

14  using the mails, private interstate carriers and interstate wire communications, said

15  defendants, through their Enterprise, sold these and other fraudulent tax schemes to

16  dozens, if not more, clients, including Plaintiff, as early as 1999-2000.  In particular,

17  without limitation, in violation of 18 U.S.C. §§ 1341 and 1343, the CARDS promoters

18  employed the Postal Service and/or private or commercial interstate carriers and/or

19  interstate wire communications to send their retainer letters, invoices, opinion letters, tax

20  advice, and investment advice to Plaintiff, and others, and to receive from Plaintiff and

21  many other clients payments of defendants' fees, all as set forth above.  On information

22  and belief, the defendants functioned as a continuing unit and had a decision-making

23  structure by which they formulated and decided how to promote, implement and conceal

24  various tax strategies, including the CARDS Facility.

25         70.     On information and belief, defendants also engaged in monetary

26  transactions in property derived from specified unlawful activity in violation of 18 U.S.C.

27  §§ 1956 and 1957, by knowingly engaging or attempting to engage in the monetary

28  transactions that constitute the CARDS facility and other tax shelter transactions described

1   herein, which involved criminally derived property greater than $10,000, insofar as the

2   amounts of the CARDS transactions were derived from knowing attempts to evade federal

3   and state income taxes.  On information and belief, the property involved in the CARDS

4   facility tax shelter transactions also involved proceeds for which defendants and the

5   CARDS promoters intended to carry on unlawful activity (namely, the failure to register

6   the CARDS transactions as a tax shelter in violation of Internal Revenue Code § 6111,

7   and the intent to evade federal and state income taxes, violating, among other laws, I.R.C.

8   § 6700), and defendants knowingly designed, developed and/or facilitated the CARDS tax

9   shelter to conceal or disguise the nature of the proceeds of this unlawful activity,

10   representing it to be a legitimate business activity and credit facility instead of an unlawful

11   attempt to evade income taxes, and avoiding reporting the CARDS transactions as tax

12   shelters.  On information and belief, the defendants promoted the CARDS transactions

13   and conducted or helped conduct the financial transactions that were a part of the CARDS

14   facility tax shelter, transporting, transmitting and/or transferring funds from the United

15   States to a place outside of the United States for the unlawful purpose of promoting,

16   facilitating and failing to register unlawful tax shelters.

17          71.    Each defendant's conduct as set forth herein was in concert with

18   each of the other defendant's conduct, and planned and arranged with and known by each

19   of the other said defendants pursuant to said defendants' common scheme to sell and

20   conceal fraudulent tax strategies for millions of dollars.

21          72.    The defendants' conduct of the Enterprise and their pattern of

22   racketeering activity commenced in the early to mid 1990's, well before when they and

23   other CARDS promoters first contacted Plaintiff in 2000 to solicit his participation in the

24   CARDS scheme and continues through the present, when the defendants continue to

25   communicate with Plaintiff, using interstate mail and wire facilities, but not to reveal and

26   in fact conceal the full extent of said defendants' racketeering conduct.

27          73.    The defendants' conduct of the Enterprise and their pattern of

28   racketeering activity were not limited to the acts involving Plaintiff but included acts

1  directed to many other clients as well, including and the numerous other criminal schemes

2  consisting of other tax shelters, as well as other CARDS facility tax shelters promoted and

3  sold to other clients in 2000 and 2001.  Said defendants engaged in numerous other

4  predicate acts by utilizing the collective resources of the members to prepare dozens of

5  other customized CARDS transactions for numerous other taxpayers, in which each

6  transaction was structured specially for the purpose of extracting large confiscatory fees

7  from a large cross section of clients, specifically customizing each of the transactions so

8  that they were unique to each victim, and forming for each such transaction, using the

9  same basic *modus operandi,* a separate limited liability company for the purpose of

10  making a sham loan and then formulating a basis for the transaction in an amount that was

11  equal to the size of the loan, thereby providing a separate and distinctive unit of activity

12  on which another sham CARDS transaction could be formed.  The same CARDS

13  promoters also sold completely different tax shelters, including numerous BLIPS and

14  other tax shelters, on which they continued to extort large set-up fees and commissions

15  based on transactions that were of little or no economic benefit to the taxpayer, and which

16  were represented as legitimate ways by which each taxpayer could minimize or eliminate

17  his tax obligations.  On information and belief, Defendants have continued to engage in

18  racketeering activity designed to promote illegal tax shelters, and to disguise and hide the

19  illegal nature of their prior acts, posing the threat of continuing criminal activity and have

20  continued to oppose the efforts of the United States Government and the Internal Revenue

21  Service to curb such activities, and have fomented the filing of frivolous lawsuits for the

22  purpose of delaying the collection of taxes from other taxpayers who have purchased the

23  customized CARDS programs, including but not limited to an action pending in the U.S.

24  District Court, California Northern District (San Jose) entitled Neil R. Douglas and

25  Christine R. Douglas, plaintiffs, v. United States of America, defendant, CO3 04518 JW,

26  knowing that the only purpose of the filing such actions would be to delay and attempt to

27  discourage the Government from collecting the taxes owed, and to prevent the Internal

28  Revenue Service from successfully policing tax laws and collecting penalties and interest

1   with respect to the sham transactions.

2          74.    The defendants' conduct violated 18 U.S.C. §§ 1962(c) and

3   1962(d).

4          75.    Were it not for the defendants' unlawful conduct in promoting,

5   facilitating, misrepresenting and concealing the business purpose and legality of the

6   CARDS facility, Plaintiff would not have entered into the CARDS facility transactions,

7   and would not have incurred the $3 million or more in fees that were paid to the CARDS

8   promoters, the hundreds of thousands of dollars in interest, not including taxes or

9   penalties, as a result of the disallowance by federal and state taxing authorities of the

10   CARDS facility and the loss of use of funds and joint defense fees related thereto.

11          76.    As a direct and proximate result of the foregoing conduct by

12   defendants, Plaintiff has been damaged in the amount of the millions of dollars of fees

13   paid to defendants and the CARDS promoters; interest and penalties payable to the IRS

14   and/or State of California as a result of the disallowance of the capital losses generated

15   from the CARDS facility on Plaintiff's 2001 tax returns; the attorneys' fees and other

16   costs incurred by Plaintiff as a result of defendants' conduct; the loss of use of funds; and

17   such other damages as Plaintiff has sustained and will continue to sustain in an amount to

18   be determined at trial.

19          77.    Plaintiff and the public are threatened with loss and injury and/or

20   irreparable harm due to Defendants' violation of the RICO laws.

21          78.    As a proximate cause of the foregoing, Plaintiff has been injured in

22   the manner described above, with the amount to be according to proof, said amount to be

23   trebled and awarded against the CARDS promoters, jointly and severally, plus attorneys'

24   fees and costs, as well as the declaratory relief sought herein.

25                  **SECOND CAUSE OF ACTION**

26                            **Fraud**

27                     **(Against All Defendants)**

28          79.    Plaintiff reasserts and incorporates by reference all of the foregoing

1    general allegations in their entirety and further alleges:

2         80.    In order to induce Plaintiff to pay millions of dollars in fees for the

3    CARDS transaction, the defendants made numerous knowingly false affirmative

4    representations and intentional omissions of material fact to Plaintiff, including, but not

5    limited to:  representing that the CARDS transaction entitled a taxpayer to offset unrelated

6    capital gains by the capital losses recognized from the transaction; failing to disclose

7    existing published authority, including notices published by the IRS, that purported losses

8    arising from similar transactions are not allowable for income tax purposes; promoting

9    and developing a transaction as a legitimate tax transaction while knowing that it was not

10   likely to be allowable for income tax purposes; promoting the CARDS Facility as a line of

11   credit or loan, when in fact, it was nothing more than a sham transaction designed to

12   create artificial, paper losses for tax purposes; concealing the manner in which the

13   CARDS Facility worked; concealing the illegal nature of the CARDS Facility, including

14   the impact of the IRS notice listing it as an abusive tax shelter; and procuring and

15   arranging allegedly independent "form" opinion letters from other defendants and

16   attorneys, while knowing that said defendants and attorneys also had a pecuniary interest

17   in the CARDS transaction and had helped to develop and/or promote the transaction.

18        81.    The above affirmative representations, or material and intentional

19   omissions of fact, made by the defendants were false when made and said defendants

20   knew them to be false when made with the intention that Plaintiff rely upon them in

21   entering into the CARDS transaction, so that the defendants could reap millions of dollars

22   in fees from the transaction.

23        82.    As a result of the foregoing, Plaintiff has been injured by the fees

24   and commissions charged for the transaction, the loss of use of funds caused by the early

25   payment of taxes, the loss of investments which were owned by Plaintiff, and such other

26   damages as Plaintiff has sustained and will continue to sustain in an amount to be

27   determined at trial.

28        **83.**    Plaintiff is informed and believes and on that basis alleges that the

1    defendants' conduct was willful, malicious, reckless, wanton and in knowing disregard of

2    their professional obligations, such that Plaintiff is entitled to recover exemplary damages

3    against the defendants in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

#### Professional Negligence

#### (Against the HVB Defendants)

7        84.        Plaintiff reasserts and incorporates by reference all of the foregoing

8    general allegations in their entirety and further alleges:

9        85.        As professional investment managers and advisors, the defendants

10    owed Plaintiff a duty of care to provide independent, unbiased, objective investment

11    advice and management with respect to the CARDS facility and its intended use, as a

12    means of recognizing capital losses for income tax purposes.  HVB provided management

13    services which included the maintenance of collateral accounts, the performance of sales

14    of the collateral deposits therein, and the generation of statements that depicted fictitious

15    sales that would defraud the IRS regarding the true nature of the transactions involved.

16    As such, the bank was performing the functions of a financial manager, and advisor, as

17    well as providing monetary services to create sales that appeared to be taxable events.

18    HVB owed Plaintiff the duty to provide that investment advice and management in good

19    faith in accordance with accepted professional standards. HVB violated this duty of care

20    by the acts alleged herein, including without limitation, by promoting the issuance of

21    identical "form" opinion letters to Plaintiff, claiming that the CARDS facility was a

22    legitimate tax transaction; by compromising its independence, objectivity and judgment

23    through providing false advice about a transaction that HVB helped develop, market,

24    promote and/or facilitate prior to the solicitation to Plaintiff of the CARDS facility; by

25    compromising its independence, objectivity and judgment by providing advice and

26    disposition of funds in transactions structured so that defendants' fees were paid as a

27    result of the client agreeing to engage in the transaction; by knowing or having reason to

28    know that the allegedly "independent" judgment and opinions of other promoters such as

1   myCFO, Sidley and LeBoeuf, were similarly compromised by their pecuniary interest in

2   the CARDS transaction and failing to disclose that knowledge to Plaintiff; by knowing or

3   having reason to know that the CARDS facility was not a legitimate tax transaction, yet

4   providing advice and/or promoting advice to Rezner to the contrary; by misrepresenting

5   the nature of the CARDS facility, claiming that it was an interest-free loan or line of

6   credit, when in fact it was simply a sham transaction designed to generate artificial, paper

7   losses for tax purposes; and by promoting the CARDS facility to Plaintiff with the sole

8   purpose of generating and collecting large fees.

9          86.     As a result of the foregoing, Plaintiff has been injured by the fees

10  and commissions charged for the transaction, the loss of use of funds caused by the early

11  payment of taxes, the loss of investments which were owned by Plaintiff, and such other

12  damages as Plaintiff has sustained and will continue to sustain in an amount to be

13  determined at trial.

14  **FOURTH CAUSE OF ACTION**

15  **Unfair Business Practices, Cal. Bus. & Prof. Code § 17200**

16  **(Against All Defendants)**

17         87.     Plaintiff reasserts and incorporates by reference all of the foregoing

18  general allegations in their entirety and further alleges:

19         88.     The Unfair Business Practices Act defines unfair business

20  competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

21  California Business & Professions Code §17200 *et seq.*

22         89.     Defendants have violated the Unfair Business Practices Act by

23  engaging in the unlawful, unfair and/or fraudulent business acts and/or practices alleged

24  herein alleged herein, including the promotion, facilitating, concealment and/or sale of the

25  CARDS facility, a transaction that they knew or should have known would be disallowed

26  by the IRS as a tax shelter, and would be likely to deceive Plaintiff, as well as numerous

27  other individuals and members of the public of the State of California, thereby depriving

28  the public of millions of dollars of tax monies and deceiving taxpaying members of the

1  public into participating in an illegal tax shelter.

2      90.    As a result of the foregoing, Plaintiff has been injured by the fees

3  and commissions charged for the transaction, the loss of use of funds caused by the early

4  payment of taxes, the loss of investments which were owned by Plaintiff, and such other

5  damages as Plaintiff has sustained and will continue to sustain in an amount to be

6  determined at trial.

7      91.    The Unfair Business Practices Act provides for restitution for

8  violations.  Plaintiff thereby requests that this Court restore all monies and fees paid by

9  him related to the CARDS transaction.

10  **PRAYER FOR RELIEF**

11  WHEREFORE, Plaintiff prays for relief and judgment against defendants

12  as follows:

13      1.    Against all Defendants, joint and severally, for actual damages in

14  an amount to be proven at trial, said amount to be trebled, plus attorneys' fees and costs,

15  for violation of RICO, 18 U.S.C. § 1962.

16      2.    Against all Defendants, an injunction enjoining Defendants from

17  engaging in the same types of conduct or endeavor alleged herein; devising, offering and

18  soliciting clients for, or promoting, tax shelters; preparing tax returns involving tax

19  shelters; providing legal advice promoting tax shelters; soliciting clients for, referring

20  clients to, or engaging in marketing or business development programs, with each other;

21  sharing fees or income with each other; committing any acts of mail fraud or wire fraud;

22  soliciting or promoting frivolous actions against the Government for refunds or otherwise

23  for the purpose of frustrating or defeating the collection of legitimate taxes; violating the

24  RICO laws; and an order requiring Defendants to divest themselves of any interest, direct

25  or indirect, in the Enterprise, and dissolving the Enterprise;

26      3.    Against all defendants, a declaration that Defendants are jointly and

27  severally liable to Plaintiff for any and all commissions paid, interest, and penalties

28  assessed in the past or future against them by the IRS and/or California tax authorities

resulting from Plaintiff's participation in the CARDS program, for the loss of use of funds to Plaintiff, and for all professional fees incurred by Plaintiff in the past or the future to rectify Defendants' wrongdoing, all such amounts to be trebled under RICO;

    4.    Against all Defendants, jointly and severally, for attorneys' fees and costs to the maximum extent provided by any applicable provision of law, including RICO;

    5.    Against all Defendants for restitution of all fees and commissions paid by Plaintiff; and

    6.    For such other and further relief as the Court may deem just or proper.

Dated: March 17, 2006

                    LUKENS LAW GROUP
                    WILLIAM M. LUKENS (State Bar No. 037196)
                    JENNIFER L. JONAK (State Bar No. 191323)


            By: _____
                    Attorneys for Plaintiff


**JURY TRIAL IS HEREBY DEMANDED**